UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD A. KEMPF, | No. C-06-3161 SC |
| Plaintiff, | |
| | MEMORANDUM OF DECISION; FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| BARRETT BUSINESS SERVICES, INC., | |
| Defendant. | |

## I.  INTRODUCTION

Plaintiff Richard Kempf ("Plaintiff" or "Kempf") brought this suit against Barrett Business Services, Inc. ("Defendant" or "Barrett"), alleging causes of action for unpaid wages, breach of contract, and wrongful termination.  See Compl., Docket No. 1. Before trial, Kempf abandoned his wrongful termination claim.  The Court held a trial on the remaining issues on June 18 and June 19, 2007.

Generally, the dispute centers around Barrett's Branch Manager Profit Sharing Bonus Program.  Kempf alleges that throughout his employment with Barrett, Defendant improperly deducted certain penalties from his quarterly bonus payments, in violation of his employment agreement.  Barrett maintains that the deductions were always part of the bonus calculation, were explained to Kempf when he began working for Barrett, and are

contemplated by the terms of the employment agreement.

Having fully considered the evidence and testimony offered at trial and the arguments of counsel, the Court by this memorandum of decision issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that Kempf is not entitled to recover damages resulting from the 30/20 adjustment to his bonus, but is entitled to damages resulting from the retroactive workers' compensation adjustment applied in the third quarter of 2005.

**II. FINDINGS OF FACT**

    **A. The Parties**

    1. Kempf is a natural person residing in the City of Loomis, in Placer County, California.

    2. Barrett is a corporation organized under the laws of the State of Maryland, with its headquarters and principal place of business in Vancouver, Washington.

    3. Barrett is a human resources management provider.  The services Barrett offers fall into three primary categories: temporary staffing, recruitment and placement of employees, and professional employer organization services (in which Barrett acts as a co-employer with its client and runs all of the client's traditional human resources functions).

    4. Barrett has 39 branch offices located in 30 states.

    5. Each Barrett branch office is managed by a branch manager, who is responsible for the branch's profit & loss,

2

growth, and regular business operations.

**B.   Kempf Begins Employment With Barrett**

6.   In March of 2002, a recruiter employed by Barrett contacted Kempf regarding an opening as the Branch Manager for Barrett's Napa and Fairfield offices.  During this discussion, Mr. Kempf informed the recruiter of his salary expectations.

7.   After the initial discussion with the recruiter, Kempf then spoke by telephone with Michael Elich ("Elich"), then Barrett's Director of Business Development, who was responsible for hiring branch managers.  Elich and Kempf spoke for nearly an hour, but did not discuss compensation at that time.

8.   Kempf and Elich subsequently met in person for an interview.  During the interview, they discussed the responsibilities of the Napa/Fairfield branch manager.  Kempf informed Elich that he expected his total compensation to exceed $100,000 per year, through a combination of salary and performance bonus.  Elich said that Barrett would meet this expectation as long as Kempf satisfied the company's growth and performance targets for the Napa and Fairfield offices.  Kempf and Elich did not discuss the breakdown of Kempf's compensation, other than that it would include a base salary and some form of profit sharing bonus.  Elich did not provide an explicit definition of "profit" during this meeting.  No one else was present during this interview, and the parties did not exchange any written documents at that time.

9.   On April 1, 2002, Kempf received a letter offering him the position of Branch Manager - Fairfield, with a base salary of

3

$75,000 per year, and profit sharing to be paid quarterly based on the branch's yearly profit. See Ex. D-503 (the "Letter").

10. Kempf returned a signed copy of the Letter to Barrett and sent a copy to the recruiter.

**C.  Branch Manager Orientation**

11. On the morning of April 2, 2002, Kempf attended a training session for new branch managers at Barrett's Roseville office. Greg Vaughn, currently a Vice President of Barrett, led the training session. In addition to Kempf and Vaughn, two other new branch managers were present.

12. During the training session, the new branch managers were given copies of the Barrett Business Services, Inc. Employment Agreement (the "Agreement") with the instruction to review it sign it by the end of lunch that day. Kempf reviewed and signed the Agreement. See Ex. D-501.

13. In the training session, Vaughn explained Barrett's financial reporting process at length, including the Barrett Branch Manager Profit Sharing Program. Mr. Vaughn provided the new branch managers with samples of Barrett's quarterly financial reports and explained the process the company used to determine the branch managers' quarterly profit sharing bonuses.

**D.  The Barrett Branch Manager Profit Sharing Program**

14. In addition to base salary, Barrett branch managers were eligible for quarterly bonuses through their participation in the Barrett Branch Manager Profit Sharing Program ("PSP"). The PSP is intended to allow branch managers to earn higher compensation based on the success of their branches.

4

1    15. Plaintiff participated in the PSP.

2    16. There is no document which explains the rules and
3 formulae governing the determination of the quarterly bonuses in
4 the PSP.

5    17. The branch managers received as a quarterly bonus a
6 percentage of the Branch Manager Bonus Basis ("Basis"). The
7 percentage of the Basis that was included in the bonus increased
8 as the Basis increased.

9    18. The Basis was determined by applying certain adjustments
10 to the branch's net income before taxes.

11    19. The adjustments to the net income before taxes include
12 an adjustment for accounts receivable, for satisfying the "30/20
13 ratio" target, and for workers' compensation expenses.

14    20. The 30/20 ratio refers to a goal that each branch spend
15 no more than 30% of its gross margin on salaries and no more than
16 20% of its gross margin on other overhead expenses. When a branch
17 exceeds either of those targets, the excess is deducted from the
18 Basis.

19    21. At the end of each quarter, the branch managers received
20 from Barrett a draft Quarterly Bonus Schedule, which showed the
21 branch's net income before taxes, the various adjustments, and the
22 Basis, as well as the bonuses for branch managers and other branch
23 employees. The branch managers had the opportunity to review the
24 draft and comment before Barrett paid the bonuses. See e.g., Ex.
25 D-583 (Nov. 3, 2003, email from Jim Miller to Kempf enclosing the
26 Quarterly Bonus Schedule).

27    22. After addressing any concerns raised by the branch

5

managers in response to the draft Quarterly Bonus Schedule, Barrett issued final Quarterly Bonus Schedules. Barrett paid the quarterly bonuses approximately 30 days after the end of the quarter. See e.g., Ex. D-510 (June 30, 2002 Quarterly Bonus Schedule).

23. Mr. Kempf received the draft Quarterly Bonus Schedule and reviewed it for each of the 14 quarters he worked for Barrett. Each of these Quarterly Bonus Schedules included a 30/20 adjustment. See Exs. D-510, D-515, D-519, D-521, D-525, D-528, D-531, D-535, D-539, D-542, D-546, D-555, D-571, D-577.

24. Although Kempf periodically asked questions about the bonus calculations for his branch, he did not challenge the propriety of the 30/20 adjustment or complain that it was not supposed to be part of the calculations under the PSP. See e.g., Exs. D-582 (Dec. 27, 2002 email from Jim Miller to Kempf regarding "November Preliminary Branch Statements"), D-584 (Nov. 8, 2003 email from Miller to Kempf regarding "3rd Quarter Branch Profit Sharing Draft Calculations"), D-586, (April 1, 2004 email from Miller to Kempf regarding "Preliminary February Financials").

25. In addition to the 30/20 ratio adjustment, beginning with the third quarter of 2005, Barrett also adjusted the quarterly Basis based on the branch's workers' compensation expenses. See Ex. D-603 (Nov. 1, 2005 email from Vaughn to branch managers regarding "Revisions to Workers' Compensation and Branch Profitability Calculations").

26. Barrett pays its own workers' compensation insurance costs (i.e., it self-insures). The Basis adjustment was intended

6

1  to bring Barrett's workers' compensation expenditures in line with
2  the industry standard "Alternative Lost Cost" or "Pure Premium"
3  rates, and to align the branches' profits and expenditures with
4  those of the company as a whole.

5   27.  Barrett announced the workers' compensation adjustment
on November 1, 2005.  See Ex. D-603.  The draft Quarterly Bonus
Schedule for the third quarter of 2005, which ended on September
30, included an adjustment for "YTD WC expense to 80% ALC for
branch manager."  See Ex. D-577.

   28.  According to Vaughn, there was no internal discussion at
Barrett regarding whether it would be better to apply the workers'
compensation adjustment prospectively only, or to apply it
retroactively.

**E.   Kempf's Termination**

   28.  Barrett terminated Kempf's employment on November 8,
2005.

   29.  During the three and a half years Kempf worked for
Barrett, the 30/20 ratio adjustment reduced his total bonus by
$7,495.00.  The workers' compensation adjustment reduced Kempf's
bonus for the third quarter of 2005 by $29,961.00.[1]

**III.  CONCLUSIONS OF LAW**

   **A.   Breach of Contract**

   "A cause of action for breach of contract is comprised of the

---

[1] During trial, after Mr. Vaughn testified regarding Plaintiff's damages calculations, the parties agreed to these figures.

7

1  following elements: (1) the contract, (2) plaintiff's performance
2  or excuse for nonperformance, (3) defendant's breach, and (4) the
3  resulting damages to plaintiff." Careau & Co. v. Sec. Pac. Bus.
4  Credit, Inc., 272 Cal. Rptr. 387, 395 (Ct. App. 1990).

The second and fourth elements are not at issue here. Barrett does not dispute that Kempf performed his obligations under the Agreement,[2] and the parties agree that Barrett's adjustments to the Basis during Kempf's employment cost Kempf $37,456.00. That leaves for the Court the questions of what the Agreement actually provided, and whether or not Barrett's adjustments constituted a breach.

### 1. Contract Interpretation

The Agreement provides that Kempf will participate in the PSP, but does not include the specific terms of the PSP. See Ex. D-501. Kempf argues that the Letter is part of the Agreement, so the Court may consider the compensation information in the Letter. If the Letter is not part of the Agreement, Kempf argues that the Agreement is ambiguous, so the Court may consider the Letter as parol evidence to resolve the ambiguity.

Barrett maintains that the Letter is not part of the Agreement, so the Court should not consider it. Further, Barrett argues that the Agreement is unambiguous, so the Court should not consider the Letter as parol evidence. Finally, Barrett asserts that even if the Court finds the Agreement to be ambiguous, the

---

[2] As discussed below, Barrett does allege that Kempf is not entitled to recover because he has unclean hands. This is different from alleging that Kempf did not perform (i.e., that Kempf breached the Agreement).

8

only parol evidence the Court should consider is the conduct of the parties following the contract.

The only authority Kempf offers for treating the Letter as part of the Agreement is Mayers v. Loew's, Inc., 221 P.2d 26 (Cal. 1950). Mayers is distinguishable, however. In that case, the defendant wanted the court to consider a letter and bulletin containing information about the effective dates of an agreement, in addition to the explicit terms of the agreement itself. See id. at 29. The letter and contract in Mayers were delivered at the same time, and with the express intent of incorporating dates from the letter into the formal written contract. See id. Here, Kempf received the Letter prior to receiving the Agreement, and it is clear that the Letter is not part of the Agreement. See Exs. D-501, D-503. The Letter states that it is a "conditional offer of employment" and that it provides an "outline" of the "overall description of [the] offer". Ex. D-501. Unlike the letter in Mayer, nothing in the Letter here suggests that it was intended to incorporate or otherwise modify the terms of the Agreement. See Mayers, 221 P.2d at 29. The Agreement is intended to represent the "entire understanding between the parties." Ex. D-501 § 15. Absent evidence that the parties intended the Letter to be part of the Agreement, the Court will not treat the Letter as such.

This does not mean that the Court will not consider the Letter at all. Because the Agreement is integrated, parol evidence is only admissible if the Agreement is in some way ambiguous. See e.g., Consol. World. Invs., Inc. v. Lido Preferred, Ltd., 11 Cal. Rptr. 2d 524, 526-27 (1992) ("One

9

1 exception to the parol evidence rule is that extrinsic evidence
2 may be introduced to explain the meaning of ambiguous contractual
3 language."). "The test of admissibility of extrinsic evidence to
4 explain the meaning of a written instrument is not whether it
5 appears to the court to be plain and unambiguous on its face, but
6 whether the offered evidence is relevant to prove a meaning to
7 which the language of the instrument is reasonably susceptible."
8 Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442.
9 P.2d 641, 644 (Cal. 1968).

10 The critical phrase in the Agreement is "participation in the
11 Barrett Branch Manager profit sharing program." See Ex. D-501 §
12 3. The Agreement does not define "participation" or "profit
13 sharing program" and it does not incorporate or otherwise refer to
14 any other document. Kempf asserts that the term "profit" refers
15 to gross income less costs, otherwise known as net income, and
16 that participation in the profit sharing program entitled him to a
17 percentage of his branch's net income without adjustments for the
18 30/20 ratio or workers' compensation. On the other hand, Barrett
19 argues that the term "profit sharing" means a "system or process
20 under which employees receive a part of an industrial or
21 commercial enterprise," which, by implication, would allow for
22 distribution of a percentage of an adjusted net income (i.e., the
23 Basis). Without looking beyond the Agreement, and in particular,
24 section 3 of the Agreement, both interpretations are plausible.
25 As such, the Court will consider parol evidence. See e.g., Garcia
26 v. Truck Ins. Exch., 682 P.2d 1100, 1104-05 (Cal. 1986)
27 (considering parol evidence to determine whether written

instrument was ambiguous; citing Pac. Gas & Elec. Co.).

After considering the parol evidence offered by both parties, the Court concludes that the phrase "participation in the Barrett Branch Manager profit sharing program" in the Agreement was not intended to require Barrett to distribute a set percentage of its unadjusted net income to branch managers. The only evidence Kempf offered at trial in support of his interpretation was the Letter. Unfortunately for Kempf, the Letter does nothing to resolve the ambiguity described above. The Letter describes the terms of the conditional offer of employment Barrett made to Kempf, including "Profit Sharing to be paid quarterly in accordance with the following schedule based on Branch's yearly profit," followed by a table of bonus percentages. See Ex. D-503. Nothing in the Letter suggests that the "profit" used in determining bonuses for the PSP was limited to net income. Further, the term "based on" implies that Barrett may adust profits before determining bonuses.

The parol evidence Barrett offered compels the same conclusion. "The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions." Kennecott Corp. v. Union Oil Co., 242 Cal. Rptr. 403, 410 (Ct. App. 1987)(citations omitted). The parties' conduct after Kempf signed the Agreement, and for the duration of his employment, demonstrates that Barrett's interpretation is the correct one. Barrett explained the 30/20 deduction during Kempf's orientation. For every quarter thereafter, Barrett sent Kempf a draft of the Quarterly Bonus Schedule reflecting an adjustment to the Basis to

11

account for the 30/20 ratio.  Kempf reviewed the Quarterly Bonus Schedules without ever challenging the 30/20 adjustment.  Prior to this litigation, both parties behaved as though adjusting the net income to determine the Basis was an accepted practice under the Agreement.[3]  Based on this conduct, and in the absence of compelling evidence to the contrary, the Court concludes that the Agreement permitted Barrett to use an adjusted net income in determining the Basis and paying bonuses to branch managers.

### 2. Breach of Contract

In light of the foregoing interpretation of the phrase "participation in the Barrett Branch Manager profit sharing program," the Court now turns to the alleged breaches.

#### a. The 30/20 Adjustment

Barrett's use of the 30/20 adjustment in calculating the Basis and Kempf's bonus did not violate the Agreement.  Kempf's sole argument for breach was that the Agreement required Barrett to pay Kempf a quarterly bonus consisting of a percentage of his branch's unadjusted quarterly net income, with the percentage based on the branch's annual net income.  In his trial brief, Kempf asserted that "Defendant expressly and unambiguously agreed to compensate Plaintiff profit sharing wages which were to be <u>based on</u> a percentage of the profits generated by Plaintiff's Branches. . . ."  Pl.'s Tr. Brief, Docket No. 16, at 9 (emphasis

---

[3] Kempf does not argue that Barrett's quarterly adjustment to the Basis for accounts receivable is improper, but he provides no explanation how the accounts receivable adjustment is legally distinct from the 30/20 adjustment.  Both reflect adjustments Barrett made to the net income in order to determine the Basis.

12

added).  It is clear that the Basis which Barrett used to determine Kempf's quarterly bonuses was "based on" his branch's net income.  During trial, Mr. Vaughn testified at length about how Barrett calculated Kempf's bonus every quarter, using the financial statements from the first quarter of 2005 to illustrate the process.  Every quarter, Kempf received a bonus which was derived in large part from his branch's net income.  Barrett's use of the 30/20 adjustment was therefore not a violation of the Agreement.

### b.   The Workers' Compensation Adjustment

The retroactive adjustment to the Basis for workers' compensation insurance in the third quarter of 2005 is more complicated.  As discussed above, the Agreement permitted Barrett to make adjustments to the net income in determining the Basis.  Further, as Barrett argues, the Agreement permitted Barrett to unilaterally modify Kempf's compensation.  See Ex. D-501 § 3 ("Further, the compensation to Employee may be modified without affecting the remaining terms, conditions, and covenants in this Agreement.").  That Barrett could change the terms of the PSP going forward is unremarkable, however.  It is the <u>retroactive</u> aspect of the workers' compensation adjustment that is problematic.

Neither party provides legal authority on the issue of retroactive modification.  Barrett cites dicta from three inapposite cases in support of its position that employers may modify compensation.  See Ladas v. Ca. State Auto. Ass'n., 23 Cal. Rptr. 2d 810, 816 (Ct. App. 1993)(implied contractual provision

13

1  requiring defendants to pay commissions comparable to "industry
2  standards" was not enforceable); Gonzales v. MetPath, Inc., 262
3  Cal. Rptr. 654, 658 (Ct. App. 1989)(affirming lower court's
4  finding that plaintiff failed to establish prima facie case for
5  employment discrimination); Rochlis v. Walt Disney Co., 23 Cal.
6  Rptr. 2d. 793, 799 (Ct. App. 1993) (contract terms Defendant
7  allegedly breached were not enforceable).

8      Barrett also argues that the modification of Kempf's
9  compensation to reflect the workers' compensation adjustment was a
10 new unilateral offer, which Kempf accepted by continuing to work.
11 Neither Barrett's legal authority nor the Agreement supports this
12 position.  The cases Barrett cites do not address retroactive
13 changes to the parties' agreements.  In Craig v. Brown & Root,
14 Inc., 100 Cal. Rptr. 2d 818, 820-21 (Ct. App. 2000), the court
15 held that the employee was bound by the terms of an arbitration
16 agreement once the company sent notice of it to the employee and
17 the employee continued to work for company.  In Newburger v.
18 Rifkind, 104 Cal. Rptr. 663, 667 (Ct. App. 1972), the question was
19 not whether the employees had agreed to the new terms proposed by
20 the employer, but whether the employees' continued employment was
21 sufficient consideration for the benefits they received under the
22 new agreement.  The Newburger court specifically noted the policy
23 favoring the treatment of modifications as offers of new
24 unilateral contracts where the employees were receiving more or
25 better benefits:

26     In our own jurisdiction the attitude is to consider the
       additional advantages to employees as being in effect
27     offers for a unilateral contract which offer is accepted

28
                              14

>if the employee continues in the employment, and not as being mere offers of gifts. They make the employees more content and happier in their jobs, cause the employees to forego their rights to seek other employment, assist in avoiding labor turnover, and are considered of advantage  to both the employer and the employees.

Id. (internal quotations and citations omitted).  Such policy is not applicable where, as here, the modification was not to the employee's advantage.

Barrett's two remaining authorities actually address the issue of retroactive modification.  In Albrant v. Sterling Furniture Co., 736 P.2d 201, 203 n.2 (Or. Ct. App. 1985), the court noted that the plaintiff was not complaining that she had not been fully compensated for prior work, only challenging the modification going forward.  The court concluded that "an employer may also modify the employment contract so long as the modification applies only prospectively."  Id. at 203 (emphasis added).  In Stieber v. Journal Publ'g Co., 901 P.2d 201, 204 (N.M. Ct. App. 1995), the court surveyed different jurisdictions and concluded that in the majority of the jurisdictions, the employer's right to terminate at-will employees such as Kempf includes a right to prospectively modify the terms of employment.  See also DiGiacinto v. Ameriko-Omserv Corp., 59 Cal. App. 4th 629, 636 (Ct. App. 1997) (collecting authority).  The weight of the authority suggests that because Kempf was an at-will employee, Barrett had the right to modify the Agreement going forward.  None of these cases suggest that Barrett could retroactively adjust Kempf's compensation when he had already performed his obligations for the third quarter of 2005.

15

The text of the Agreement does not help Barrett either. Pursuant to section 15 of the Agreement, "No modification or addition hereto shall be valid except by a writing signed by the parties hereto." Ex. D-501 § 15. By characterizing the workers' compensation adjustment in November 2005 as a modification to the Agreement, Barrett invokes section 15. Kempf did not agree in writing to the new adjustment to the Basis calculation. Even had he agreed to the modification implicitly by continuing to work for Barrett (which is not clearly the case, since he was terminated within days of Barrett announcing the change in Basis calculation), such implied acceptance would only have applied from that point forward.

By September 30, 2005, Kempf had completed performance of his contractual obligations to Barrett for the third quarter, and was entitled to the agreed-upon compensation. Barrett's decision in November of 2005 to pay Kempf less than the PSP authorized at the time Kempf completed performance was a violation of the Agreement. The parties agreed at trial that the workers' compensation adjustment reduced Kempf's third quarter 2005 bonus by $29,961.00. Kempf is therefore entitled to recover this amount on his breach of contract claim.

**B.  Willful Withholding of Wages**

Kempf alleges that Barrett willfully refused to pay him wages due at the time of his termination. Pursuant to California Labor Code section 203, where an employer willfully fails to pay wages of an employee who is discharged or who quits, "the wages of the employee shall continue as a penalty from the due date thereof at

16

the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

The only question here is whether Barrett's failure to pay Kempf what it withheld pursuant to the workers' compensation adjustment meets the legal standard for willfulness. In California, the failure to pay wages is willful "when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude the imposition of waiting time penalties under Section 203." Cal. Code. Regs. tit. 8 § 13520. The regulation goes on to define a "good faith dispute" as one that occurs "when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did not exist." Id. § 13850(a).

Barrett put forth legitimate defenses to Kempf's breach of contract claim. Although Kempf prevailed on a portion of that claim, the Court is satisfied that there was a good faith dispute as to whether Barrett owed Kempf any unpaid wages. As such, the Court declines to impose the statutory waiting period penalties.

**C. Unclean Hands**

Barrett asserts as a defense that Kempf has unclean hands, and is therefore not entitled to relief. "In California, the doctrine of unclean hands may apply to legal as well as equitable claims and to both tort and contract remedies." Camp v. Jeffer, Mangels, Butler, & Marmaro, 41 Cal. Rptr. 2d 329, 340 (Ct. App.

17

1995).  The defense applies only where the plaintiff's alleged wrongful act related directly to the subject of the law suit and affects the balance of the equities between the parties.  Id. (citing Fibreboard Paper Prods. Co. v. East Bay Union of Machinists, Local 1304, 39 Cal. Rptr. 64, 97 (Ct. App. 1964)).

In its brief, Barrett argued that Kempf's management of branch financials violated corporate policy.  Def.'s Tr. Brief, Docket No. 22, at 19.  Despite these purported violations, Elich testified at trial that there was nothing specific wrong with Kempf's work, and that he fired Kempf due to a general decline in confidence.  Barrett argues that Kempf's poor management of the branch's expenses caused the adjustments at dispute in this case, so he is responsible for his own damages.  At trial, Vaughn testified that there was nothing Kempf could have done to change the workers' compensation adjustment or its effect on Kempf's bonus.  If Kempf could not have affected the outcome, his behavior has no effect on the equities between the parties.

Barrett failed to prove its unclean hands defense.  All of the testimony presented at trial either conflicted with or seriously undermined this argument.

**IV. CONCLUSION**

For the foregoing reasons, the Court finds that Barrett's use of the 30/20 ratio in determining the Basis was not a violation of the Agreement, but that the retroactive workers' compensation adjustment was.  The Court therefore AWARDS Kempf $29,961.00 in damages on his breach of contract claim.  The parties shall bear

18

their own costs.

    IT IS SO ORDERED.

    Dated: July 31, 2007



UNITED STATES DISTRICT JUDGE

19