UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD A. KEMPF,                        )    No. C-06-3161 SC
                                         )
                    Plaintiff,           )
                                         )    AMENDED MEMORANDUM OF
                                         )    DECISION; FINDINGS OF
        v.                               )    FACT AND CONCLUSIONS
                                         )    OF LAW
                                         )
BARRETT BUSINESS SERVICES, INC.,         )
                                         )
                    Defendant.           )
_____ )

**I.   INTRODUCTION**

        Plaintiff Richard Kempf ("Plaintiff" or "Kempf") brought this
suit against Barrett Business Services, Inc. ("Defendant" or
"Barrett"), alleging causes of action for unpaid wages, breach of
contract, and wrongful termination.  See Compl., Docket No. 1.
Before trial, Kempf abandoned his wrongful termination claim.  The
Court held a trial on the remaining issues on June 18 and 19,
2007.[1]

        Generally, the dispute centers around Barrett's Branch
Manager Profit Sharing Bonus Program.  Kempf alleges that

---

[1]The Court first issued this Memorandum of Decision, Findings
of Fact and Conclusions of Law on July 31, 2007.  See Docket No.
34.  Plaintiff moved the Court to amend certain aspects of this
order pursuant to Federal Rule of Civil Procedure 59(e).  See
Docket No. 43.  The Court granted that motion in part and issues
this Amended Memorandum of Decision; Findings of Fact and
Conclusions of Law pursuant to that order.  See Docket No. 46.  The
substantive amendments appear in sections III.B, III.E, III.F, and
IV of this memorandum.

United States District Court
For the Northern District of California

throughout his employment with Barrett, Defendant improperly deducted certain penalties from his quarterly bonus payments, in violation of his employment agreement. Barrett maintains that the deductions were always part of the bonus calculation, were explained to Kempf when he began working for Barrett, and are contemplated by the terms of the employment agreement.

Having fully considered the evidence and testimony offered at trial and the arguments of counsel, the Court by this memorandum of decision issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that Kempf is not entitled to recover damages resulting from the 30/20 adjustment to his bonus, but is entitled to damages resulting from the retroactive workers' compensation adjustment applied in the third quarter of 2005.

**II.   FINDINGS OF FACT**

   **A.   The Parties**

   1.   Kempf is a natural person residing in the City of Loomis, in Placer County, California.

   2.   Barrett is a corporation organized under the laws of the State of Maryland, with its headquarters and principal place of business in Vancouver, Washington.

   3.   Barrett is a human resources management provider. The services Barrett offers fall into three primary categories: temporary staffing, recruitment and placement of employees, and professional employer organization services (in which Barrett acts

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

as a co-employer with its client and runs all of the client's traditional human resources functions).

4.   Barrett has 39 branch offices located in 30 states.

5.   Each Barrett branch office is managed by a branch manager, who is responsible for the branch's profit & loss, growth, and regular business operations.

**B.   Kempf Begins Employment With Barrett**

6.   In March of 2002, a recruiter employed by Barrett contacted Kempf regarding an opening as the Branch Manager for Barrett's Napa and Fairfield offices.  During this discussion, Mr. Kempf informed the recruiter of his salary expectations.

7.   After the initial discussion with the recruiter, Kempf then spoke by telephone with Michael Elich ("Elich"), then Barrett's Director of Business Development, who was responsible for hiring branch managers.  Elich and Kempf spoke for nearly an hour, but did not discuss compensation at that time.

8.   Kempf and Elich subsequently met in person for an interview.  During the interview, they discussed the responsibilities of the Napa/Fairfield branch manager.  Kempf informed Elich that he expected his total compensation to exceed $100,000 per year, through a combination of salary and performance bonus.  Elich said that Barrett would meet this expectation as long as Kempf satisfied the company's growth and performance targets for the Napa and Fairfield offices.  Kempf and Elich did not discuss the breakdown of Kempf's compensation, other than that it would include a base salary and some form of profit sharing bonus.  Elich did not provide an explicit definition of "profit"

3

United States District Court
For the Northern District of California

during this meeting.  No one else was present during this interview, and the parties did not exchange any written documents at that time.

9.   On April 1, 2002, Kempf received a letter offering him the position of Branch Manager - Fairfield, with a base salary of $75,000 per year, and profit sharing to be paid quarterly based on the branch's yearly profit.  <u>See</u> Ex. D-503 (the "Letter").

10. Kempf returned a signed copy of the Letter to Barrett and sent a copy to the recruiter.

**C.  Branch Manager Orientation**

11.   On the morning of April 2, 2002, Kempf attended a training session for new branch managers at Barrett's Roseville office.  Greg Vaughn, currently a Vice President of Barrett, led the training session.  In addition to Kempf and Vaughn, two other new branch managers were present.

12.   During the training session, the new branch managers were given copies of the Barrett Business Services, Inc. Employment Agreement (the "Agreement") with the instruction to review it sign it by the end of lunch that day.  Kempf reviewed and signed the Agreement.  <u>See</u> Ex. D-501.

13.   In the training session, Vaughn explained Barrett's financial reporting process at length, including the Barrett Branch Manager Profit Sharing Program.  Mr. Vaughn provided the new branch managers with samples of Barrett's quarterly financial reports and explained the process the company used to determine the branch managers' quarterly profit sharing bonuses.

///

4

**United States District Court**
For the Northern District of California

### D.   The Barrett Branch Manager Profit Sharing Program

14.   In addition to base salary, Barrett branch managers were eligible for quarterly bonuses through their participation in the Barrett Branch Manager Profit Sharing Program ("PSP"). The PSP is intended to allow branch managers to earn higher compensation based on the success of their branches.

15.   Plaintiff participated in the PSP.

16.   There is no document which explains the rules and formulae governing the determination of the quarterly bonuses in the PSP.

17.   The branch managers received as a quarterly bonus a percentage of the Branch Manager Bonus Basis ("Basis"). The percentage of the Basis that was included in the bonus increased as the Basis increased.

18.   The Basis was determined by applying certain adjustments to the branch's net income before taxes.

19.   The adjustments to the net income before taxes include an adjustment for accounts receivable, for satisfying the "30/20 ratio" target, and for workers' compensation expenses.

20.   The 30/20 ratio refers to a goal that each branch spend no more than 30% of its gross margin on salaries and no more than 20% of its gross margin on other overhead expenses. When a branch exceeds either of those targets, the excess is deducted from the Basis.

21.   At the end of each quarter, the branch managers received from Barrett a draft Quarterly Bonus Schedule, which showed the branch's net income before taxes, the various adjustments, and the

United States District Court

For the Northern District of California

Basis, as well as the bonuses for branch managers and other branch employees. The branch managers had the opportunity to review the draft and comment before Barrett paid the bonuses. See e.g., Ex. D-583 (Nov. 3, 2003, email from Jim Miller to Kempf enclosing the Quarterly Bonus Schedule).

22. After addressing any concerns raised by the branch managers in response to the draft Quarterly Bonus Schedule, Barrett issued final Quarterly Bonus Schedules. Barrett paid the quarterly bonuses approximately 30 days after the end of the quarter. See e.g., Ex. D-510 (June 30, 2002 Quarterly Bonus Schedule).

23. Mr. Kempf received the draft Quarterly Bonus Schedule and reviewed it for each of the 14 quarters he worked for Barrett. Each of these Quarterly Bonus Schedules included a 30/20 adjustment. See Exs. D-510, D-515, D-519, D-521, D-525, D-528, D-531, D-535, D-539, D-542, D-546, D-555, D-571, D-577.

24. Although Kempf periodically asked questions about the bonus calculations for his branch, he did not challenge the propriety of the 30/20 adjustment or complain that it was not supposed to be part of the calculations under the PSP. See e.g., Exs. D-582 (Dec. 27, 2002 email from Jim Miller to Kempf regarding "November Preliminary Branch Statements"), D-584 (Nov. 8, 2003 email from Miller to Kempf regarding "3rd Quarter Branch Profit Sharing Draft Calculations"), D-586 (April 1, 2004 email from Miller to Kempf regarding "Preliminary February Financials").

25. In addition to the 30/20 ratio adjustment, beginning with the third quarter of 2005, Barrett also adjusted the

6

**United States District Court**
For the Northern District of California

quarterly Basis based on the branch's workers' compensation expenses. See Ex. D-603 (Nov. 1, 2005 email from Vaughn to branch managers regarding "Revisions to Workers' Compensation and Branch Profitability Calculations").

26. Barrett pays its own workers' compensation insurance costs (i.e., it self-insures). The Basis adjustment was intended to bring Barrett's workers' compensation expenditures in line with the industry standard "Alternative Lost Cost" or "Pure Premium" rates, and to align the branches' profits and expenditures with those of the company as a whole.

27. Barrett announced the workers' compensation adjustment on November 1, 2005. See Ex. D-603. The draft Quarterly Bonus Schedule for the third quarter of 2005, which ended on September 30, included an adjustment for "YTD WC expense to 80% ALC for branch manager." See Ex. D-577.

28. According to Vaughn, there was no internal discussion at Barrett regarding whether it would be better to apply the workers' compensation adjustment prospectively only, or to apply it retroactively.

**E.  Kempf's Termination**

29. Barrett terminated Kempf's employment on November 8, 2005.

30. During the three and a half years Kempf worked for Barrett, the 30/20 ratio adjustment reduced his total bonus by $7,495.00. The workers' compensation adjustment reduced Kempf's

bonus for the third quarter of 2005 by $29,961.00.[2]

**III.   CONCLUSIONS OF LAW**

   **A.   Breach of Contract**

   "A cause of action for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." <u>Careau & Co. v. Sec. Pac. Bus. Credit, Inc.</u>, 272 Cal. Rptr. 387, 395 (Ct. App. 1990).

   The second and fourth elements are not at issue here. Barrett does not dispute that Kempf performed his obligations under the Agreement,[3] and the parties agree that Barrett's adjustments to the Basis during Kempf's employment cost Kempf $37,456.00. That leaves for the Court the questions of what the Agreement actually provided, and whether or not Barrett's adjustments constituted a breach.

      1.   <u>Contract Interpretation</u>

   The Agreement provides that Kempf will participate in the PSP, but does not include the specific terms of the PSP. <u>See</u> Ex. D-501. Kempf argues that the Letter is part of the Agreement, so the Court may consider the compensation information in the Letter. If the Letter is not part of the Agreement, Kempf argues that the

----

      [2]During trial, after Mr. Vaughn testified regarding Plaintiff's damages calculations, the parties agreed to these figures.

      [3]As discussed below, Barrett does allege that Kempf is not entitled to recover because he has unclean hands. This is different from alleging that Kempf did not perform (i.e., that Kempf breached the Agreement).

**United States District Court**
For the Northern District of California

Agreement is ambiguous, so the Court may consider the Letter as parol evidence to resolve the ambiguity.

Barrett maintains that the Letter is not part of the Agreement, so the Court should not consider it. Further, Barrett argues that the Agreement is unambiguous, so the Court should not consider the Letter as parol evidence. Finally, Barrett asserts that even if the Court finds the Agreement to be ambiguous, the only parol evidence the Court should consider is the conduct of the parties following the contract.

The only authority Kempf offers for treating the Letter as part of the Agreement is Mayers v. Loew's, Inc., 221 P.2d 26 (Cal. 1950). Mayers is distinguishable, however. In that case, the defendant wanted the court to consider a letter and bulletin containing information about the effective dates of an agreement, in addition to the explicit terms of the agreement itself. See id. at 29. The letter and contract in Mayers were delivered at the same time, and with the express intent of incorporating dates from the letter into the formal written contract. See id. Here, Kempf received the Letter prior to receiving the Agreement, and it is clear that the Letter is not part of the Agreement. See Exs. D-501, D-503. The Letter states that it is a "conditional offer of employment" and that it provides an "outline" of the "overall description of [the] offer". Ex. D-501. Unlike the letter in Mayer, nothing in the Letter here suggests that it was intended to incorporate or otherwise modify the terms of the Agreement. See Mayers, 221 P.2d at 29. The Agreement is intended to represent the "entire understanding between the parties." Ex. D-501 § 15.

Absent evidence that the parties intended the Letter to be part of the Agreement, the Court will not treat the Letter as such.

This does not mean that the Court will not consider the Letter at all. Because the Agreement is integrated, parol evidence is only admissible if the Agreement is in some way ambiguous. See e.g., Consol. World. Invs., Inc. v. Lido Preferred, Ltd., 11 Cal. Rptr. 2d 524, 526-27 (1992) ("One exception to the parol evidence rule is that extrinsic evidence may be introduced to explain the meaning of ambiguous contractual language."). "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442. P.2d 641, 644 (Cal. 1968).

The critical phrase in the Agreement is "participation in the Barrett Branch Manager profit sharing program." See Ex. D-501 § 3. The Agreement does not define "participation" or "profit sharing program" and it does not incorporate or otherwise refer to any other document. Kempf asserts that the term "profit" refers to gross income less costs, otherwise known as net income, and that participation in the profit sharing program entitled him to a percentage of his branch's net income without adjustments for the 30/20 ratio or workers' compensation. On the other hand, Barrett argues that the term "profit sharing" means a "system or process under which employees receive a part of an industrial or

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

commercial enterprise," which, by implication, would allow for

distribution of a percentage of an adjusted net income (i.e., the

Basis). Without looking beyond the Agreement, and in particular,

section 3 of the Agreement, both interpretations are plausible.

As such, the Court will consider parol evidence. See e.g., Garcia

v. Truck Ins. Exch., 682 P.2d 1100, 1104-05 (Cal. 1986)

(considering parol evidence to determine whether written

instrument was ambiguous; citing Pac. Gas & Elec. Co.).

After considering the parol evidence offered by both parties,

the Court concludes that the phrase "participation in the Barrett

Branch Manager profit sharing program" in the Agreement was not

intended to require Barrett to distribute a set percentage of its

unadjusted net income to branch managers. The only evidence Kempf

offered at trial in support of his interpretation was the Letter.

Unfortunately for Kempf, the Letter does nothing to resolve the

ambiguity described above. The Letter describes the terms of the

conditional offer of employment Barrett made to Kempf, including

"Profit Sharing to be paid quarterly in accordance with the

following schedule based on Branch's yearly profit," followed by a

table of bonus percentages. See Ex. D-503. Nothing in the Letter

suggests that the "profit" used in determining bonuses for the PSP

was limited to net income. Further, the term "based on" implies

that Barrett may adust profits before determining bonuses.

The parol evidence Barrett offered compels the same

conclusion. "The conduct of the parties after execution of the

contract and before any controversy has arisen as to its effect

affords the most reliable evidence of the parties' intentions."

11

United States District Court
For the Northern District of California

1   <u>Kennecott Corp. v. Union Oil Co.</u>, 242 Cal. Rptr. 403, 410 (Ct.

2   App. 1987)(citations omitted).  The parties' conduct after Kempf

3   signed the Agreement, and for the duration of his employment,

4   demonstrates that Barrett's interpretation is the correct one.

5   Barrett explained the 30/20 deduction during Kempf's orientation.

6   For every quarter thereafter, Barrett sent Kempf a draft of the

7   Quarterly Bonus Schedule reflecting an adjustment to the Basis to

8   account for the 30/20 ratio.  Kempf reviewed the Quarterly Bonus

9   Schedules without ever challenging the 30/20 adjustment.  Prior to

10  this litigation, both parties behaved as though adjusting the net

11  income to determine the Basis was an accepted practice under the

12  Agreement.[4]  Based on this conduct, and in the absence of

13  compelling evidence to the contrary, the Court concludes that the

14  Agreement permitted Barrett to use an adjusted net income in

15  determining the Basis and paying bonuses to branch managers.

16       2.  <u>Breach of Contract</u>

17       In light of the foregoing interpretation of the phrase

18  "participation in the Barrett Branch Manager profit sharing

19  program," the Court now turns to the alleged breaches.

20       a.  <u>The 30/20 Adjustment</u>

21       Barrett's use of the 30/20 adjustment in calculating the

22  Basis and Kempf's bonus did not violate the Agreement.  Kempf's

23  sole argument for breach was that the Agreement required Barrett

24

25       [4]Kempf does not argue that Barrett's quarterly adjustment to
    the Basis for accounts receivable is improper, but he provides no
26  explanation how the accounts receivable adjustment is legally
    distinct from the 30/20 adjustment.  Both reflect adjustments
27  Barrett made to the net income in order to determine the Basis.

28                                   12

United States District Court
For the Northern District of California

to pay Kempf a quarterly bonus consisting of a percentage of his branch's unadjusted quarterly net income, with the percentage based on the branch's annual net income.  In his trial brief, Kempf asserted that "Defendant expressly and unambiguously agreed to compensate Plaintiff profit sharing wages which were to be based on a percentage of the profits generated by Plaintiff's Branches. . . ."  Pl.'s Tr. Brief, Docket No. 16, at 9 (emphasis added).  It is clear that the Basis which Barrett used to determine Kempf's quarterly bonuses was "based on" his branch's net income.  During trial, Mr. Vaughn testified at length about how Barrett calculated Kempf's bonus every quarter, using the financial statements from the first quarter of 2005 to illustrate the process.  Every quarter, Kempf received a bonus which was derived in large part from his branch's net income.  Barrett's use of the 30/20 adjustment was therefore not a violation of the Agreement.

b.  The Workers' Compensation Adjustment

The retroactive adjustment to the Basis for workers' compensation insurance in the third quarter of 2005 is more complicated.  As discussed above, the Agreement permitted Barrett to make adjustments to the net income in determining the Basis.  Further, as Barrett argues, the Agreement permitted Barrett to unilaterally modify Kempf's compensation.  See Ex. D-501 § 3 ("Further, the compensation to Employee may be modified without affecting the remaining terms, conditions, and covenants in this Agreement.").  That Barrett could change the terms of the PSP going forward is unremarkable, however.  It is the retroactive

13

aspect of the workers' compensation adjustment that is problematic.

Neither party provides legal authority on the issue of retroactive modification.  Barrett cites dicta from three inapposite cases in support of its position that employers may modify compensation.  See Ladas v. Ca. State Auto. Ass'n., 23 Cal. Rptr. 2d 810, 816 (Ct. App. 1993)(implied contractual provision requiring defendants to pay commissions comparable to "industry standards" was not enforceable); Gonzales v. MetPath, Inc., 262 Cal. Rptr. 654, 658 (Ct. App. 1989)(affirming lower court's finding that plaintiff failed to establish prima facie case for employment discrimination); Rochlis v. Walt Disney Co., 23 Cal. Rptr. 2d 793, 799 (Ct. App. 1993) (contract terms Defendant allegedly breached were not enforceable).

Barrett also argues that the modification of Kempf's compensation to reflect the workers' compensation adjustment was a new unilateral offer, which Kempf accepted by continuing to work. Neither Barrett's legal authority nor the Agreement supports this position.  The cases Barrett cites do not address retroactive changes to the parties' agreements.  In Craig v. Brown & Root, Inc., 100 Cal. Rptr. 2d 818, 820-21 (Ct. App. 2000), the court held that the employee was bound by the terms of an arbitration agreement once the company sent notice of it to the employee and the employee continued to work for company.  In Newburger v. Rifkind, 104 Cal. Rptr. 663, 667 (Ct. App. 1972), the question was not whether the employees had agreed to the new terms proposed by the employer, but whether the employees' continued employment was

14

sufficient consideration for the benefits they received under the new agreement. The Newburger court specifically noted the policy favoring the treatment of modifications as offers of new unilateral contracts where the employees were receiving more or better benefits:

> In our own jurisdiction the attitude is to consider the additional advantages to employees as being in effect offers for a unilateral contract which offer is accepted if the employee continues in the employment, and not as being mere offers of gifts. They make the employees more content and happier in their jobs, cause the employees to forego their rights to seek other employment, assist in avoiding labor turnover, and are considered of advantage to both the employer and the employees.

Id. (internal quotations and citations omitted). Such policy is not applicable where, as here, the modification was not to the employee's advantage.

Barrett's two remaining authorities actually address the issue of retroactive modification. In Albrant v. Sterling Furniture Co., 736 P.2d 201, 203 n.2 (Or. Ct. App. 1985), the court noted that the plaintiff was not complaining that she had not been fully compensated for prior work, only challenging the modification going forward. The court concluded that "an employer may also modify the employment contract so long as the modification applies only prospectively." Id. at 203 (emphasis added). In Stieber v. Journal Publ'g Co., 901 P.2d 201, 204 (N.M. Ct. App. 1995), the court surveyed different jurisdictions and concluded that in the majority of the jurisdictions, the employer's right to terminate at-will employees such as Kempf includes a right to prospectively modify the terms of employment.

15

See also DiGiacinto v. Ameriko-Omserv Corp., 59 Cal. App. 4th 629, 636 (Ct. App. 1997) (collecting authority).  The weight of the authority suggests that because Kempf was an at-will employee, Barrett had the right to modify the Agreement going forward.  None of these cases suggest that Barrett could retroactively adjust Kempf's compensation when he had already performed his obligations for the third quarter of 2005.

The text of the Agreement does not help Barrett either.  Pursuant to section 15 of the Agreement, "No modification or addition hereto shall be valid except by a writing signed by the parties hereto."  Ex. D-501 § 15.  By characterizing the workers' compensation adjustment in November 2005 as a modification to the Agreement, Barrett invokes section 15.  Kempf did not agree in writing to the new adjustment to the Basis calculation.  Even had he agreed to the modification implicitly by continuing to work for Barrett (which is not clearly the case, since he was terminated within days of Barrett announcing the change in Basis calculation), such implied acceptance would only have applied from that point forward.

By September 30, 2005, Kempf had completed performance of his contractual obligations to Barrett for the third quarter, and was entitled to the agreed-upon compensation.  Barrett's decision in November of 2005 to pay Kempf less than the PSP authorized at the time Kempf completed performance was a violation of the Agreement.  The parties agreed at trial that the workers' compensation adjustment reduced Kempf's third quarter 2005 bonus by $29,961.00.  Kempf is therefore entitled to recover this amount on his breach

16

**United States District Court**
For the Northern District of California

1  of contract claim.

2      **B.  Nonpayment of Wages in Violation Of Section 201**

3      The Court must now consider whether, based on the established

4  facts, the retroactive adjustment to the bonus calculation also

5  amounted to a violation of California Labor Code section 201(a).

6  Neither party has provided the Court with any guidance on this

7  issue beyond what was contained in the pre-trial briefing and what

8  was argued during trial.

9      The California Labor Code's protections against unpaid wages

10 are applicable not only to employees paid by the hour, but also to

11 salaried executives such as Kempf.  See On-Line Power, Inc. v.

12 Mazur, 57 Cal. Rptr. 3d 698, 702 (Ct. App. 2007).  It is

13 immaterial that a salaried employee may also have a claim for

14 breach of contract.  See id. at 703.  According to the Labor Code,

15 "wages" are defined to include "all amounts for labor performed by

16 employees of every description, whether the amount is fixed or

17 ascertained by the standard of time, task, piece, commission

18 basis, or other method of calculation."  Cal. Labor Code § 200(a).

19 This includes incentive-based bonuses such as the PSP.  See

20 Neisendorf v. Levi Strauss & Co., 49 Cal. Rptr. 3d 216, 225 (Ct.

21 App. 2006) (stating that "bonuses are 'wages' within the meaning

22 of Labor Code section 200") (citing Lucian v. All States Trucking

23 Co., 171 Cal. Rptr. 262, 263 (Ct. App. 1981)).

24     Pursuant to California Labor Code section 201(a), "[i]f an

25 employer discharges an employee, the wages earned and unpaid at

26 the time of discharge are due and payable immediately."  Cal.

27 Labor Code § 201(a).  When Barrett terminated Kempf on November 8,

28

17

United States District Court

For the Northern District of California

2005, it owed him the full and unadjusted amount of the third quarter bonus.  Barrett did not dispute that Kempf was due some bonus for the quarter, as it sent him a quarterly bonus schedule and paid him the adjusted bonus.  The only dispute is over the amount.  The Court has already determined that the retroactive adjustment reduced Kempf's bonus by $29,961.00.  The Court now concludes that, as a matter of law, Barrett's failure to pay Kempf the unadjusted bonus at the time of his termination was a violation of California Labor Code section 201(a).

**C.  Willful Withholding of Wages in Violation of Section 203**

Kempf alleges that Barrett willfully refused to pay him wages due at the time of his termination.  Pursuant to California Labor Code section 203, where an employer willfully fails to pay wages of an employee who is discharged or who quits, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."  Cal. Labor Code § 203.

The only question here is whether Barrett's failure to pay Kempf what it withheld pursuant to the workers' compensation adjustment meets the legal standard for willfulness.  In California, the failure to pay wages is willful "when an employer intentionally fails to pay wages to an employee when those wages are due.  However, a good faith dispute that any wages are due will preclude the imposition of waiting time penalties under Section 203."  Cal. Code. Regs. tit. 8 § 13520.  The regulation goes on to define a "good faith dispute" as one that occurs "when

18

an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee.  The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did not exist."  <u>Id.</u> § 13850(a).

Barrett put forth legitimate defenses to Kempf's breach of contract claim.  Although Kempf prevailed on a portion of that claim, the Court is satisfied that there was a good faith dispute as to whether Barrett owed Kempf any unpaid wages.  As such, the Court declines to impose the statutory waiting period penalties.

### D.  Unclean Hands

Barrett asserts as a defense that Kempf has unclean hands, and is therefore not entitled to relief.  "In California, the doctrine of unclean hands may apply to legal as well as equitable claims and to both tort and contract remedies."  <u>Camp v. Jeffer, Mangels, Butler, & Marmaro</u>, 41 Cal. Rptr. 2d 329, 340 (Ct. App. 1995).  The defense applies only where the plaintiff's alleged wrongful act related directly to the subject of the law suit and affects the balance of the equities between the parties.  <u>Id.</u> (citing <u>Fibreboard Paper Prods. Co. v. East Bay Union of Machinists, Local 1304</u>, 39 Cal. Rptr. 64, 97 (Ct. App. 1964)).

In its brief, Barrett argued that Kempf's management of branch financials violated corporate policy.  Def.'s Tr. Brief, Docket No. 22, at 19.  Despite these purported violations, Elich testified at trial that there was nothing specific wrong with Kempf's work, and that he fired Kempf due to a general decline in confidence.  Barrett argues that Kempf's poor management of the

United States District Court
For the Northern District of California

branch's expenses caused the adjustments at dispute in this case, so he is responsible for his own damages.  At trial, Vaughn testified that there was nothing Kempf could have done to change the workers' compensation adjustment or its effect on Kempf's bonus.  If Kempf could not have affected the outcome, his behavior has no effect on the equities between the parties.

Barrett failed to prove its unclean hands defense.  All of the testimony presented at trial either conflicted with or seriously undermined this argument.

### E.   Entitlement to Attorney's Fees and Litigation Costs

Section 218.5 of the California Labor Code provides that "[i]n any action brought for the nonpayment of wages . . . the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action."  Cal. Labor Code § 218.5.  Kempf requested an award of fees and costs in the Complaint.  See Compl. ¶ 29.  Because the Court has now found that Barrett violated section 201(a), Kempf is entitled to recover reasonable attorney's fees and costs.

### F.   Prejudgment Interest

Section 218.6 of the California Labor Code provides that a prevailing plaintiff in an action for nonpayment of wages may recover interest from the date the wages were due.  See Cal. Labor Code § 218.6.  The appropriate interest rate is 10% per year, as determined in California Civil Code section 3289.  See id.; Cal. Civ. Code § 3289(b).  Having prevailed on his section 201 claim, Kempf is entitled to prejudgment interest on the unpaid wages.

Pursuant to section 201(a), the unpaid wages were due on November 8, 2005, the date on which Barrett terminated Kempf's employment. Interest therefore began to accrue on November 8, 2005, and stopped accruing on July 31, 2007, the date on which the Court originally entered judgment in this matter.

**IV.   CONCLUSION**

For the foregoing reasons, the Court finds that Barrett's use of the 30/20 ratio in determining the Basis was not a violation of the Agreement, but that the retroactive workers' compensation adjustment violated both the Agreement and the California Labor Code.  The Court therefore AWARDS Kempf $29,961.00 in damages, plus $5179.56 in prejudgment interest.  The Court further AWARDS Kempf his reasonable attorney's fees and litigation costs.


IT IS SO ORDERED.

Dated: November 20, 2007

_____

UNITED STATES DISTRICT JUDGE